Michael W. O'ROURKE, Shirley M. O'Rourke and Kathleen O'Rourke, Plaintiffs,

v.

The CITY OF NORMAN, a Municipal Corporation,

Kelvin Winter and Doug McKenzie, individually and in their official capacity as duly authorized law enforcement officers for the City of Norman, and

Steve Cain, individually and in his official capacity as police supervisor and a duly authorized law enforcement officer for the City of Norman, Defendants.

No. CIV–85–10–B.

United States District Court, W.D. Oklahoma.

June 19, 1986.
Findings of Fact on Record and Conclusions of Law Regarding Rule 11 July 18, 1986.
Judgment on Attorneys' Fees July 18, 1986.

Michael Salem, Norman, Okl., for plaintiffs.

Louis W. Bullock, Tulsa, Okl., for Michael Salem.

Burton J. Johnson, Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., H. Lee Schmidt, City Atty., Patricia D. Herron, Asst. City Atty., Norman, Okl., for all defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOHANON, District Judge.

This matter came on for trial before this court on May 13, 1986, through May 29, 1986, and the court, having fully reviewed the exhibits, the testimony of the witnesses and the arguments presented by the parties plaintiff and defendant, now finds and concludes as follows:

#### Findings of Fact

1. Deborah Boyd is the daughter of the plaintiffs Michael W. O'Rourke and Shirley M. O'Rourke and the sister of the plaintiff Kathleen O'Rourke.

2. On the dates in question in this case, May 14, 1983, through May 16, 1983, there was an outstanding bench warrant for the arrest of Deborah Boyd for contempt of court issued by the district court of Cleveland County, Oklahoma. The warrant arose out of the failure of Deborah Boyd to pay a judgment rendered against her in favor of one Claire J. Robillard, and Boyd's subsequent failure to obey an order to appear and show cause why she should not be found in contempt of court.

3. On May 14, 1983, at approximately 3:00 p.m. Officer R.J. Cook of the Norman Police Department, accompanied by Officer L.D. Moore, received a radio call from the police dispatcher to proceed to the Safeway Store at the corner of Southwest 24th Street and West Main in Norman, Oklahoma, and there contact a woman who had called the dispatcher to report that Ms. Boyd was in the Safeway Store and that

there was a warrant for her arrest. The officers were met at the store by Linda Robillard, mother of Claire Robillard, who told them that Boyd had left the store. Robillard then gave the officers a description of the vehicle Boyd was in and also an address where she believed Boyd lived. The officers proceeded to the address, followed by Robillard who was not certain of the exact address but was familiar with the house. The address given to the officers was incorrect, but Robillard was able to point to the correct house: the O'Rourke residence at 2602 Chateau Drive. The vehicle described by Robillard as being used by Boyd was not in the driveway nor was it in the garage of that house, and it appeared to the officers from an external examination of the house that nobody was at home. Officer Moore knocked on the door and rang the doorbell but received no answer. The officers decided that Boyd was not there, but before leaving the scene they told Robillard to contact the police department if she located Boyd again.

4. At the time Officers Cook and Moore visited the O'Rourke house on May 14, Michael O'Rourke was in fact inside the house, accompanied by his son Wesley and witnessed the actions of the officers and Mrs. Robillard.

5. Michael O'Rourke recognized Robillard when she drove up in front of his house with the officers on May 14 and knew from numerous telephone calls made to the O'Rourke residence by both Linda and Claire Robillard that they were attempting to obtain satisfaction of the judgment against Deborah Boyd. Mr. O'Rourke had once told Linda Robillard that the judgment would be satisfied over his dead body.

6. Wesley O'Rourke, on February 11, 1983, received service at the 2602 Chateau address, on behalf of Deborah Boyd his sister, of the citation of contempt in the Robillard case which resulted in issuance of the subject bench warrant for Boyd's arrest when she did not appear and show cause as ordered by the citation.

7. On May 16, 1983, at approximately 9:30 p.m., Linda Robillard called the Norman Police Department to report that Deborah Boyd was at the 2602 Chateau residence. The telephone call was a conference call with Robillard's daughter Claire patched in from a third location. Linda Robillard briefly recounted the events of the previous Sunday, May 14, to the police PBX operator and explained that there was a warrant for the arrest of Deborah Boyd. Linda Robillard was not herself certain that Boyd was at 2602 Chateau at that moment. Claire, however, stated that her source, an unidentified male, was definite that Boyd was there at that time. The PBX operator called the Cleveland County Sheriff's office while the Robillards were still on the line and confirmed that there was a bench warrant for Deborah Boyd and that the address given on the warrant was 2602 Chateau. The PBX operator also determined that the case number on the warrant was SC–82–1952 and that bail was set at $500.

8. After concluding the conversation with Robillard, the PBX operator contacted Officer Kelvin Winter, one of the defendants in this action, told him that there was a bench warrant for him to serve and informed him of the charge, the name of the defendant, the residence of the defendant, the case number and the amount of bail. Winter was also told that an identified person had called to report that Boyd was at the 2602 Chateau residence. At Winter's request, Officer Douglas McKenzie, also a defendant in the present action, agreed to accompany Winter to attempt to serve the warrant.

9. Officers Winter and McKenzie arrived at 2602 Chateau at approximately 10:00 p.m. From the outside, they could see that several lights were on in the house and they heard the telephone ring, saw Mr. O'Rourke answer it and saw other people moving around inside the residence. They knocked on the front door and were greeted by a "white juvenile female," Kathleen O'Rourke. (For reasons unknown, at the trial of this action all three plaintiffs testified that the door was initially answered by

the mother, Shirley O'Rourke, and not by Kathleen. The court, however, having had an opportunity to observe the countenances of all the witnesses as they testified, and the various inconsistencies of their testimony, is very unfavorably impressed with the credibility of the O'Rourke family and sees no reason to accept any portion of their story that may conflict with the account given by the defendant officers whose testimony was forthright and candid.) The officers asked Kathleen whether she was Deborah Boyd, and she said no, that Deborah was her sister and was not at home right then. She then went to get her parents. At trial, the officers testified that Kathleen hesitated and displayed some uncertainty or nervousness while talking with them.

Michael O'Rourke came to the door and told the officers that Deborah Boyd was not at home right then though she did live there, had been present earlier, and would return later. He offered to tell Boyd the officers were looking for her the following morning. Officer McKenzie asked O'Rourke if he knew where Boyd was, and O'Rourke answered that she was at work. When asked where Boyd worked, O'Rourke refused to give that information to the officers. McKenzie then advised O'Rourke that it was not wise for him to withhold information concerning Boyd's whereabouts and that he could be arrested if he obstructed the officers. O'Rourke then asserted that he didn't know where Boyd worked. While this conversation was going on, the officers noticed that other people inside the house were peeking around corners at them.

Officer McKenzie then, out of courtesy, asked O'Rourke for permission to search the residence for Boyd, but when permission was refused told him that the officers had a right to make the search whether or not permission was given because they had probable cause to believe Boyd was there. O'Rourke said that he thought he was within his rights to refuse to give the officers permission for the search and asked them if he could call his lawyer and the police department about the matter. O'Rourke invited the officers to come into the house to have a seat while he used the telephone. The officers agreed and followed O'Rourke into the kitchen and dining room area of the house but remained standing during O'Rourke's calls.

O'Rourke was unable to contact his lawyer but did reach and talk with the officers' supervisor, Lt. Steve W. Cain, also a defendant in this action, at the Norman Police Department. Cain already knew that officers McKenzie and Winter were attempting to serve an arrest warrant at 2602 Chateau. O'Rourke described the events that had occurred since the officers had arrived at the house, and then asked Cain if the officers were correct in stating that they had a right to search the house for Boyd. Cain told O'Rourke that if the officers had a warrant for Boyd's arrest and probable cause to believe that she might be in the residence, they did not need a search warrant and did have a right to enter the residence and search for Boyd. O'Rourke then questioned Cain about what was meant by probable cause. While trying to explain the matter to O'Rourke, Cain asked if the officers were where he, Cain, could talk to them. O'Rourke answered "No" though the officers were at that time standing in the same room with him. The conversation concluded with O'Rourke telling Cain that he wanted him to understand that the officers did not have permission to search the residence. Cain immediately thereafter attempted to reach officers McKenzie and Winter by radio but was unable because the officers had turned the volume down on their walkie-talkies in order to minimize any disturbance to the occupants of the house.

After his conversation with Cain, O'Rourke called his wife and daughter into the room where the officers were and had them witness while he stated to the officers that he would not physically resist a search but that he was expressly not granting them permission to search the house. The officers indicated that they understood his position and then asked O'Rourke to ac-

knowledge that they had been courteous, which he did.

The officers then searched the residence without finding Deborah Boyd. At the time the officers were in the house, all of the family members in the house were fully dressed except for Deborah Boyd's two year old son who was asleep in a bedroom. The officer who searched that room was careful not to disturb the child.

After giving Mr. O'Rourke their names and badge numbers, at his request, the officers left the house.

10. Approximately 20 minutes after officers Winter and McKenzie left 2602 Chateau, Mr. O'Rourke went to the police station and spoke again with Lt. Cain about the incident. Cain answered O'Rourke's questions as well as he could but had not yet had an opportunity to speak with McKenzie and Winter. He explained to O'Rourke the procedure for filing a formal complaint. O'Rourke obtained a blank complaint which he filled out and filed later that night. A few days later, O'Rourke also filed an addendum to the complaint. In neither the original complaint nor the addendum did O'Rourke assert that his house was not the residence of Deborah Boyd or that he had told the officers McKenzie and Winter as much. O'Rourke claimed only that he told the officers Boyd was not in the house at the time. In his addendum, O'Rourke admitted that he had refused to answer one line of questions put to him by the officers, though the addendum went on to assert that O'Rourke "really had no answer at that time." The addendum also for the first time asserted that "in failing to counsel with these officers, Lt. Cain contributed heavily [sic] to the sequence of events which occurred in this complaint."

11. On May 14 and 16, 1983, 2602 Chateau, Norman, Oklahoma, was Deborah Boyd's residence. This finding is based upon the evidence of Boyd's frequent and continued use of that address for purposes of employment applications, legal matters and documents, and upon the statements made by Kathleen and Michael O'Rourke to officers Winter and McKenzie the night of May 16, 1983, the testimony of Linda Robillard at the trial of this matter, the fact that Boyd has never established any other address or residence having a lasting or permanent character, and the fact, uncontested by plaintiffs, that Deborah Boyd's son, who was entrusted to her custody by court order, was clearly living at the 2602 Chateau address.

12. Plaintiffs in the original complaint in this action asserted that during his telephone conversation with Lt. Cain the night of May 16, 1983, "Plaintiff MICHAEL O'ROURKE ... requested Defendant CAIN to instruct the officers not to search the premises without a search warrant as required by law and defendant CAIN refused." This statement is false inasmuch as Michael O'Rourke in fact prevented Cain from talking with the officers by deliberately misleading Cain about whether the officers were available to speak with him on the telephone. Furthermore, plaintiffs knew this statement to be false at the time they filed their complaint.

In the final pretrial order filed herein May 5, 1986, and bearing plaintiff counsel's signature, it is alleged by plaintiffs that

Steve Cain, a supervisory police officer of the City of Norman, had the opportunity to prevent the search intrusion into the O'Rourke household ... immediately prior to the search when Plaintiff Michael O'Rourke phoned defendant Cain to request Cain's assistance in resisting the search, but ... Defendant Cain failed to take any action to prevent the search....

This allegation is, again, false. Cain did not have any opportunity to prevent the search at the time of his phone conversation with O'Rourke, even had he been disposed to do so, because O'Rourke deliberately prevented Cain from talking with the officers by deceiving Cain about the officers' location. The plaintiffs knew this allegation to be false at the time they agreed to the final pretrial order.

13. In their original complaint in this action, plaintiffs asserted that the defend-

ant City of Norman and the individual police officer defendants "and other similarly negligently screened, trained and supervised police officers have and will continue to conduct equivalent illegal searches and seizures against other citizens similar to or identical to [sic] the unconstitutional and illegal search committed against the Plaintiffs...." At no time throughout the pretrial or trial proceedings in this case did plaintiffs present to the court any evidence whatsoever of similar searches or circumstances having occurred at any time in the City of Norman.

14. In their portion of the final pretrial order, the plaintiffs repeatedly assert that Deborah Boyd did not reside at the 2602 Chateau house the night of the search here in question. They also assert that "[a]t numerous times, [Michael O'Rourke] insisted that she did not live there" to officers Winter and McKenzie that night. These statements are false. The court has found that 2602 Chateau was in fact Deborah Boyd's legal and actual residence at the time in question and has further found, upon the evidence and testimony before it, that O'Rourke never told the officers his house was not Boyd's residence that night; rather, he specifically acknowledged to them that she did live in that house.

Like Michael O'Rourke's complaint with the Norman Police Department, the plaintiffs' original complaint in the present proceedings did not allege either that 2602 Chateau was not Deborah Boyd's residence or that O'Rourke had told Officers Winter and McKenzie as much on the night in question.

15. The law enforcement training actually received by the individual defendants in this case, and all other Norman police officers, greatly exceeds all statutory requirements and is more than adequate to inform them of relevant case law.

16. Plaintiffs have wholly failed to produce even a scintilla of evidence that the City of Norman has been negligent in the hiring, training or supervising of its police officers.

17. Plaintiffs have not produced any evidence that would justify injunctive relief against the defendant officers and City of Norman.

18. Plaintiffs have not produced any evidence that would compel or justify certification of this cause as a class action.

19. The plaintiffs brought this action in bad faith, with a purpose to harass the officers of the Norman Police Department in the lawful performance of their duties and to penalize Linda Robillard, originally named as a defendant but subsequently dismissed, for using lawful means to aid her daughter Claire in securing her lawful rights. The court finds upon the record and the evidence in the case that after filing their suit the plaintiffs conjured the fiction that 2602 Chateau, Norman, Oklahoma, was not the legal and actual residence of Deborah Boyd on the night in question and purposed to willfully make false statements to the court about what occurred and was said at their house in a wholly deceitful attempt to bring their claim within the more stringent standards laid down by the Supreme Court for searches of third-party residences. *See e.s. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

### Conclusions of Law

1. It is a serious matter whenever law enforcement officers intrude upon the privacy of a home in order to conduct any kind of search. Officers should always bear uppermost in their minds that they are constrained to act within the limits established by the Constitution of the United States and that individuals have a right to refuse officers entry into their houses to conduct unreasonable searches. By the same token, however, the Constitution presents no bar to the search of a residence where such search is reasonable upon all the relevant facts and circumstances or supported by a duly issued warrant. U.S. Const. amend. IV.

2. The court has previously ruled in this case that the legality of the search challenged by plaintiffs and the validity of the arrest warrant upon which it was prem-

ised must be determined by reference to federal constitutional law and not by reference to Oklahoma state law. Order of May 7, 1986, *citing Cooper v. California,* 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967); *McNeese v. Board of Education,* 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963); *Anderson v. Haas,* 341 F.2d 497, 499 (3rd Cir.1965); 42 U.S.C. § 1983 (1982). Though plaintiffs' counsel purported to make an oral motion to reconsider this matter at trial, he offered no persuasive authority whatsoever and the ruling therefore stands as entered.

■ 3. When Officers Winter and McKenzie went to the O'Rourke house at 2602 Chateau, they knew that a warrant for the arrest of Deborah Boyd existed which stated on its face that Boyd's address was 2602 Chateau Drive, Norman, Oklahoma. They also had the benefit of Claire Robillard's statement to the police PBX operator, during the conference call with Linda Robillard, that Deborah Boyd was definitely at 2602 Chateau at that time. The officers were entitled to give substantial weight to this information supplied by an identified informant (Robillard).

In *Easton v. City of Boulder, Colorado,* 776 F.2d 1441 (1985), the Tenth Circuit Court of Appeals summarized the law relating to use of citizen informant evidence specifically with a view toward obtaining an arrest warrant or making a warrantless arrest, but the court's summation is also applicable to probable cause determinations generally:

> ... when examining informant evidence used to support a claim of probable cause for a warrant, or a warrantless arrest, the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness.
>
> > Courts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness. As noted by Justice Harlan in *United States v. Harris* [403 U.S. 573, 579, 91 S.Ct. 2075, 2079, 29 L.Ed.2d 723 (1971) (dissenting opinion)], "the ordinary citizen who has never before reported a crime to the police may, in fact, be more reliable than one who supplies information on a regular basis." ...
>
> 1 W.R. LaFave, *Search and Seizure,* 586–587 (1978); *cf. Jaben v. United States,* 381 U.S. 214, 224, 85 S.Ct. 1365, 1370, 14 L.Ed.2d 345 (1965). This relaxed standard is consistent with the common sense approach taken by the Supreme Court in defining probable cause. "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of every day life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949) *quoted in Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

*Id.* at 1449–1450. Robillard's information also was not deprived of value by the fact that it contained elements of hearsay. The Supreme Court

> has long held that "the term 'probable cause' ... means less than evidence which would justify condemnation," *Locke v. United States,* 7 Cranch 339, 348, 3 L.Ed. 364, and that a finding of "probable cause" may rest upon evidence which is not legally competent in a criminal trial. *Draper v. United States,* 358 U.S. 307, 311, 79 S.Ct. 329, 331, 3 L.Ed.2d 327.

*United States v. Ventresca,* 380 U.S. 102, 107, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965). The information given by the Robillards was also confirmed to some extent by the PBX operator's determination that there did in fact exist a warrant for the arrest of Deborah Boyd and that the address on the warrant was the same as the address given by Claire Robillard when reporting Boyd's current location.

**1460**

Upon arriving at the house, the officers were able to see from the outside that there were several people inside. The officers were greeted at the door by a teen-aged girl, Kathleen, who identified herself as the sister of Deborah Boyd and stated that Boyd was not home right then. Kathleen's answer implied two things: 1) that this was in fact Deborah Boyd's home and 2) that it was mere happenstance that Boyd was not then present. Kathleen's nervous manner provided the officers with some reason to be on the alert for the possibility that all was not normal in the household. This, of course, could not constitute probable cause in and of itself but could contribute to the officers' overall assessment of probable cause.

Michael O'Rourke's initial statement to the officers also confirmed that Deborah Boyd was living at the house and further that she had recently been there and would return by the following morning. This information did little to undermine the Robillard's statements and in fact served to confirm them somewhat. If the Robillards were wrong about Boyd's immediate location, it was a mistake caused by a fairly recent movement by Boyd. When O'Rourke refused to tell the officers where Boyd worked, the officers knew 1) that he wanted to withhold information about Boyd's whereabouts, and 2) that he had a hostile attitude toward the police and was inclined to obstruct their efforts to locate Boyd. The court, having had the opportunity to observe Mr. O'Rourke first hand as he testified at trial in this matter, notes that O'Rourke's hostility toward law enforcement personnel is readily apparent, and the court can well understand how the officers could have concluded that O'Rourke was willing to resort to deceit in order to hinder them.

Officer McKenzie also had on previous occasions encountered deceit and hostility in dealing with other members of the O'Rourke family, noteably the son Wesley, in a criminal context. Again, while this by itself would not give the officers probable cause to search the house and might not be legally competent evidence in a criminal

trial, it was one more factor which officer McKenzie was entitled to consider when assessing the credability of the O'Rourke statements that Deborah Boyd was not in the house. In sum, the officers had reason to believe that Kathleen and Michael O'Rourke were lying to them and, on the other hand, they had corroborated information from an identified citizen informant indicating that Deborah Boyd was then in the house. The totality of the evidence known by the officers was not indubitable or necessarily convincing, but it was sufficient to justify a reasonable person in the officers' position in concluding that Deborah Boyd was *probably* in the house. *United States v. Ventresca; Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The fact that Boyd was not in fact found in the house subsequently, of course, has no bearing whatsoever on the validity of the officers' assessment of probable cause.

■ The court, therefore, concludes that officers Winter and McKenzie had probable cause to believe that Deborah Boyd was present at 2602 Chateau Drive while they were there on the evening of May 16, 1983.

The court notes plaintiffs' suggestion that the officers were motivated to search the O'Rourke house because they resented Mr. O'Rourke's assertion of his constitutional rights, and finds that it lacks merit. The court believes upon all the evidence that Officers Winter and McKenzie conducted themselves in an exemplary manner, with utmost courtesy, throughout the relevent events and that their sole motivation was dedication to duty. It is in any event apparent that O'Rourke did not invoke the Constitution until after the officers had decided they had probable cause and declared their intention to make a search.

4. In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Court held:

> If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is

justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Id.* at 602, 603, 100 S.Ct. at 1388, 1389. Because the *Payton* court referred to the citizen's participation in a *felony* in arriving at its decision, a question may be raised as to whether an arrest warrant pertaining to a lesser offense carries with it the same authority to enter a dwelling lived in by the suspect. The Supreme Court has never specifically addressed this latter point, and it is also unnecessary for this court to express an opinion on the matter in order to resolve the case now before it.

■ 5. Courts have an inherent power to punish contempt. Early in the history of this nation, the United States Supreme Court recognized that "To fine for contempt, imprison for contumacy, enforce the observance of order, & c., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others: and so far our courts, no doubt, possess powers not immediately derived from statute...." *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). It is significant that at the same time the High Court recognized this inherent power of all courts, it specifically held that circuit courts of the United States could not exercise common-law jurisdiction in criminal cases. Thus, it was long ago recognized that there were essential differences between contempt proceedings and criminal prosecutions. This distinction was further illuminated in *Myers v. United States,* 264 U.S. 95, 44 S.Ct. 272, 68 L.Ed. 577 (1924) which stated that contempt proceedings "are *sui generis*—neither civil actions nor prosecutions for offenses, within the ordinary meaning of those terms—and exertions of the power inherent in all courts to enforce obedience, something they must possess in order properly to perform their functions." *Id.* at 103, 44 S.Ct. at 273.

Despite this apparent difference in the *source* of authority for contempt and ordinary criminal proceedings, the distinctive character of contempt proceedings has at the same time been blurred somewhat by other decisions. Courts are inclined to refer to contempt proceedings themselves as being either "civil" or "criminal," depending, respectively, on whether the punishment imposed is intended to coerce the defendant into doing what he was supposed to do and is contingent upon his further disobedience, or is designed instead to vindicate the authority of the court and does not terminate upon the defendant's voluntary compliance with a court order. *U.S. v. Hilburn,* 625 F.2d 1177, 1179 (5th Cir. 1980); *Ager v. Jane C. Stormont Hospital & Training, Etc.,* 622 F.2d 496, 499–500 (10th Cir.1980). The Supreme Court has further inclined to treat criminal contempt like any other crime with respect to the constitutional and statutory rights of the accused.

In *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), the Court said "Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both." *Id.* at 201, 88 S.Ct. at 1481. The *Bloom* Court also quoted with approval Justice Holmes' statement that "These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech." *Gompers v. United States,* 233 U.S. 604, 610, 34 S.Ct. 693, 695, 58 L.Ed. 1115 (1914) (The portion quoted dealt with the applicability of a general criminal statute of limitations.) *quoted in Bloom* at 391 U.S. 201, 88 S.Ct. at 1481.

*Bloom* held that criminal contempt must be treated like any other crime insofar as the defendant's constitutional right to jury trial is concerned, and the court indicated that contempts could, like other crimes, be

considered either petty or serious, depending on the penalty actually imposed. 391 U.S. at 210–211, 88 S.Ct. at 1486–1487; *cf.* 18 U.S.C. § 1 (1982). Petty crimes, including petty contempts, "need not be tried to a jury." 391 U.S. at 210, 88 S.Ct. at 1486; *Dyke v. Taylor Implement Mfg. Co.,* 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968); *see also Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969) (punishment of contempt by a suspended sentence and three years probation did not exceed the penalties authorized for petty offenses and therefore did not require a jury trial.)

Although we are not concerned here with a contempt defendant's right to a jury trial, the High Court's reference to petty and serious offenses in the cases just mentioned sheds some light on an issue of relevance. In *Frank v. United States,* the Court decided that, at least for federal criminal contempt cases, the line between petty and serious contempt would be drawn by reference to the statutory scheme of penalties created by Congress for criminal offenses in general, including particularly 18 U.S.C. § 1. That statute creates three basic categories of offense as follows:

> Notwithstanding any Act of Congress to the contrary:
>
> (1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony.
>
> (2) Any other offense is a misdemeanor.
>
> (3) Any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both, is a petty offense.

Following this scheme, it is clear that petty contempts should be considered misdemeanors and not felonies. By the same token, it is evident from *Bloom* that not all contempts are petty offenses and, indeed, that some contempts are such serious matters that they may be considered felonies.

In *Bloom,* for example, the defendant was sentenced to 24 months imprisonment.[1]

The answer to the question whether contempts may be felonies is even clearer under Oklahoma state law, the law governing the contempt citation against Deborah Boyd in the present case. At the time of the events concerned in the present action, the Oklahoma Statute relating to punishment for contempt, 21 O.S. § 566 (1981), stated simply "Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court." More than a year after these events, in 1984, the Oklahoma legislature amended § 566 so that it now reads:

> Unless otherwise provided for by law, punishment for direct or indirect contempt shall be by the imposition of a fine in a sum not exceeding Five Hundred Dollars ($500.00) or by imprisonment in the county jail not exceeding six (6) months, or by both, at the discretion of the court.

It is noteworthy that the legislature by its amendment made three changes in § 566. 1) fines for contempt were limited to $500.00; 2) imprisonments for contempt were limited to 6 months duration; and 3) imprisonments for contempt were restricted to the county jail. Each of these changes indicate the legislature's acknowledgment that the courts of Oklahoma were not previously so limited in the penalties they could impose for contempt. Before 1984 there was no maximum fine or period of imprisonment for contempt, and there was nothing to prevent a court from sentencing a defendant convicted of contempt to a term of imprisonment in the State Prison.

This latter point is significant because the Oklahoma Statutes define a felony as "a crime which is, *or may be,* punishable with death, or by imprisonment in the State Prison." 21 O.S. § 5 (1981) (emphasis added). In *Braly v. Wingard,* 326 P.2d 775, 776 (Okla.1958), the Supreme Court of

---

**1.** The sentence in *Bloom* was imposed by an Illinois state court, and it might therefore be inappropriate to evaluate it strictly by reference to the federal statutes. Nonetheless, the length of sentence is illustrative.

Oklahoma interpreted this language to mean that "It is not the actual punishment imposed but the extent to which punishment may be imposed which controls the point whether the crime is a felony...."; cf. *Soetarto v. Immigration and Naturalization Service,* 516 F.2d 778, 781 (7th Cir. 1975) (maximum punishment set by statute determines whether offense is felony or misdemeanor).

■ It follows logically that during the time period relevant to this case, all contempts were felonies under Oklahoma law, and that when officers Winter and McKenzie searched the residence of Deborah Boyd on May 16, 1983, they were doing so pursuant to a felony warrant for her arrest.

This is provided, of course, that the court had ordered Boyd's arrest for purposes of criminal, and opposed to civil, contempt proceedings. As noted earlier, however, whether the contempt was civil or criminal is a matter determined by reference to the nature and purpose of the punishment actually imposed—a matter uniquely within the discretion of the judge and not ascertainable by police officers, no matter how diligent their efforts, at the time they are seeking to arrest a party named in an arrest warrant.

Similarly, if the seriousness of the offense underlying the warrant must be evaluated without reference to state law, it was impossible for officers Winter, McKenzie and Cain to determine the seriousness of the offense, as well as its civil or criminal character, prior to the arrest. *Bloom* states: "when the legislature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty which may be imposed, we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." 391 U.S. at 211, 88 S.Ct. at 1486.

It would be patently unfair, and most disruptive to effective law enforcement, to require police officers to second-guess the court commanding them when deciding how to proceed with the service of warrants entrusted to them. It is the conclusion of this court that officers Winter, McKenzie and Cain were entirely justified in treating the warrant involved here as a felony warrant and that there was no amount of training or supervision by the defendant City of Norman that could have improved the performance of these officers in this matter or made it more acceptable under the United States Constitution.

6. Based upon the foregoing findings and conclusions, the court further concludes that the search of Deborah Boyd's residence the night of May 16, 1983, by the defendant officers Kelvin Winter and Doug McKenzie violated no constitutional rights of the plaintiffs Michael W. O'Rourke, Shirley M. O'Rourke and Kathleen O'Rourke and that judgment should therefore be entered in favor of all defendants against the plaintiffs. The court expresses no opinion as to whether a search conducted today under identical circumstances, since the revision of 21 O.S. § 566 by the Oklahoma legislature in 1984, would violate any rights of persons in a position similar to that of the O'Rourkes in this case.

An appropriate judgment will accordingly be entered herein.

### JUDGMENT

Based upon the Findings of Fact and Conclusions of law filed herein this day,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendants, the City of Norman, Kelvin Winter, Doug McKenzie, and Steve Cain, have judgment against the plaintiffs, Michael W. O'Rourke, Shirley M. O'Rourke and Kathleen O'Rourke on all claims advanced by the plaintiff's complaint. The time for appeal from this judgment is stayed until the scheduled hearing on attorney fees is concluded and the court has made its final ruling on that question as well.

### FINDINGS OF FACT ON THE RECORD AND CONCLUSIONS OF LAW REGARDING RULE 11 FED.R.CIV.P. AND 28 U.S.C. § 1927

This matter came on for hearing before this court on July 7, 1986, on whether the

defendants' requested attorney fees and costs were reasonable and whether sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure [1] and 28 U.S.C. § 1927,[2] should be imposed against the plaintiffs or plaintiffs' counsel. Appearing in the latter issue for Michael Salem was Louis Bullock, an attorney from Tulsa, Oklahoma.

Mr. Michael Salem, counsel for the plaintiffs, received notice of the Rule 11 sanction hearing through a show cause order issued by this court on June 23, 1986. On June 26, 1986, in granting Mr. Salem's motion to continue the hearing so that his attorney could appear, this court notified Mr. Salem that sanctions under 28 U.S.C. § 1927 would also be considered. Mr. Bullock, at the hearing, moved to quash the motion on due process grounds. After denying said motion, this court offered Mr. Salem's counsel, Mr. Louis Bullock, a further continuance. Mr. Bullock declined to further continue the matter.

The court heard evidence regarding the question of attorney fees and concludes that Berton J. Johnson's claim of $35,418.27 is a fair and reasonable amount for his representation of the individual officers. The court further concludes that Patricia D. Herron's claim of $24,450.75 is a fair and reasonable amount for her representation of the City of Norman. The court concludes that the bill of costs in the amount of $2,098.85, as certified by the court clerk, is also a fair and reasonable amount.

The court then heard evidence on the sanctions issue. The evidence was neither persuasive nor convincing that the court should not impose attorney fees and costs as sanctions upon the plaintiffs and/or their counsel, Michael Salem, for their violations of Rule 11 and/or § 1927.

The court, having fully reviewed the entire case record and the exhibits, the testimony of witnesses and the arguments presented by counsel at the July 7 hearing, now finds and concludes as follows:

### Findings of Fact on the Record

1. The findings of fact and conclusions of law filed on June 19, 1986, are hereby reaffirmed and incorporated herein.

2. Papers signed by Michael Salem, affixed with his address, and filed with this court, including the complaint, supplemental complaint, trial brief, supplemental trial brief, and final pretrial order contain statements that are utterly false and wholly unsubstantiated.

3. Before filing these papers, Michael Salem did not make a reasonable inquiry to determine whether the statements were well grounded in fact. Salem spoke only to his clients. While counsel did contact the City of Norman, asking for the results of the police department's internal investigation into the events of May 16, 1983, he did

---

**1.** The pertinent text of Rule 11 imposes a stringent standard of conduct on attorneys:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11.

**2.** 28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

not attempt to conduct an investigation of his own. Numerous sources of information which could have shed light on his clients' claims were ignored by Michael Salem. Counsel did not call either Linda or Claire Robillard to determine what information they provided to the police dispatcher. Counsel made no effort to interview the O'Rourkes' neighbors to ascertain whether they knew if Deborah Boyd lived at 2602 Chateau. He did not contact instructors at the Police Academy, such as Sam Chapman who proved a most knowledgeable witness at trial, to discover the extent of the Fourth Amendment curriculum. He did not speak with the Cleveland County Sheriff.

In Salem's contacts with the City of Norman, the only source consulted other than his clients, he demanded only the results of the Police Department's internal investigation of his clients' complaint. He did not interview the officers or ask the City for its version of the facts. He merely demanded a remedy based on his clients' unsubstantiated assertions.

4. Based upon either a lack of reasonable inquiry beyond the bald assertions of his clients or participation in his clients' improper purpose to harass the Norman Police Department and penalize the Robillards, Michael Salem signed and filed papers with the court containing the following allegations which are false and, respectively, dishonest:

A. **The plaintiffs alleged that 2602 Chateau was not Deborah Boyd's residence.** (Trial Brief, p. 4–5; Supp. Trial Brief, p. 2; Pretrial Order, p. 7, 9, 11).

Deborah Boyd frequently and continually utilized this address for telephone calls, legal matters, and employment applications. Since 1982, Boyd never established any other lasting or permanent address. Indeed, the plaintiffs informed the officers on May 16 that their daughter, Deborah Boyd, did live at 2602 Chateau.

The allegation that 2602 Chateau was not Boyd's residence did not surface until a full year after suit was filed. This belated fabrication was part of a fraudulent effort to frame the May 16 search as a search of a third-party residence. The assertions were a clear violation of Rule 11 because they were not only a sham, but also filed for an improper purpose.

B. **The plaintiffs alleged that the "meeting" on May 14 held at 2602 Chateau occurred "for the purpose of harassing and frightening the plaintiffs into later providing information regarding their daughter's whereabouts...."** (Complaint, p. 6)

No evidence was presented that the officers acted with an intent to harass and their actions certainly do not reveal such an improper intent. On May 14, the officers Cook and Moore merely looked in the garage and rang the door bell at 2602 Chateau. The plaintiffs, who were inside their home observing the officers' actions did not answer the door. Concluding that no one was home, the officers left the scene. The plaintiffs' allegation was not grounded in fact and thus was a violation of Rule 11.

C. **Plaintiffs alleged that the "meeting" of May 14 was also part of a conspiracy to deprive the plaintiffs of their constitutional rights.** (Complaint, p. 9)

The plaintiffs did not introduce a shred of evidence that the occurrences on May 14 were a conspiratorial device employed to harass or frighten the O'Rourkes. The lack of factual foundation for this assertion places the allegation in clear violation of Rule 11. Moreover, these groundless claims against Cook and Moore were not dismissed until approximately one year after the suit was filed.

D. **Plaintiffs alleged that Robillard acted in malicious prosecution and abuse of process because she intended her actions to result in an illegal search.** (Complaint, pp. 9–10)

The allegation that Robillard acted with the intent and purpose to cause

an illegal search is likewise unsupported, facially ludicrous, and a violation of Rule 11.

The court is aware of counsel's claim that had he been provided with the transcript of the phone conversation between Robillard and the police dispatcher, he might not have joined Robillard in this suit. Yet, the court is also mindful of the fact that even after provided with the transcript, counsel did not dismiss Robillard from the case until some five months later.

E. **The plaintiffs alleged that on May 16, 1983, the plaintiffs informed the officers "numerous times" that Deborah Boyd did not live at 2602 Chateau and that the plaintiffs did not know her whereabouts.** (Complaint, p. 7; Trial Brief, p. 6; Pretrial Order, p. 8).

This allegation is, again, false and a lie. In reality, the plaintiffs told Officers Winter and McKenzie that, although Boyd was out at the moment, she did live at their home. Mr. O'Rourke told the officers that his daughter was at work but refused to tell the officers where Boyd was employed.

F. **The plaintiffs alleged that Lt. Cain refused to stop the search or otherwise interfere after Mr. O'Rourke requested his assistance.** (Complaint, pp. 8, 10; Trial Brief, pp. 6–7; Supp. Trial Brief, p. 5; Pretrial Order, pp. 9–10).

During the phone conversation between Mr. O'Rourke and Lt. Cain, Cain asked if he could speak with his officers. Even though the officers were standing in the same room with Mr. O'Rourke, he told Lt. Cain that the officers were not available. The plaintiff in fact prevented Cain from taking any action by deliberately misleading Cain and refusing to let Cain speak to the officers. Any allegation that Cain refused to act is therefore a violation of Rule 11.

G. **Plaintiffs alleged that on May 16 the officers threatened the plaintiffs with physical force.** (Pretrial Order, p. 9)

No evidence was presented to support any claims of threats of physical violence. The plaintiffs themselves admitted that the officers were extremely courteous while in the O'Rourke home. This allegation also violates Rule 11.

H. **The plaintiffs alleged that the events of May 16 were the result of a conspiracy between Robillard, the Norman Police Department, and the Cleveland County Sheriff's Office.** (Complaint, p. 9)

Throughout the course of this proceeding, no evidence was ever offered to substantiate a conspiracy claim. This claim is totally without merit and a clear violation of Rule 11.

I. **Plaintiffs allege that the City of Norman negligently screens, hires, trains and supervises its police officers.** (Complaint, p. 10–11; Trial Brief, p. 11; Pretrial Order, p. 15)

At no time did the plaintiff produce any evidence of a credible nature showing negligence in the screening, hiring, training or supervising of its officers. Rather, the evidence revealed that the City did adequately screen, hire, train and supervise its officers. The law enforcement training of these officers was exemplary and exceeded all Oklahoma statutory requirements.[3] Rule 11 forbids such false and unreasonable allegations.

J. **Plaintiffs alleged that it is departmental policy in the Norman Police Department to conduct unconstitutional searches without a warrant.** (Complaint, p. 10–11; Trial Brief, p. 11; Pretrial Order, p. 15)

The officers all received extensive Fourth Amendment instruction and no proof was introduced that the department established any policies which would contradict the officers' training.

---

**3.** The Oklahoma Legislature requires 300 hours of accredited instruction for police certification. 70 O.S. § 3311(D)(2) 1985. Each of these officers had received in excess of 600 hours.

This totally unsubstantiated assertion violates Rule 11.

K. **Plaintiffs alleged that departmental training has resulted in other illegal searches both before and after the search of the O'Rourkes' home on May 16, 1983.** (Complaint, p. 11)

Evidence of other searches was similarly non-existent. The plaintiffs' attempt to base a class action suit on such an unwarranted assertion violates Rule 11.

L. **Plaintiffs alleged that the Department doesn't supervise its officers correctly because Lt. Cain "permitted" the search at 2602 Chateau.** (Complaint, p. 10; Pretrial Order, p. 10)

As previously delineated, the plaintiff obstructed any inclination Cain might have possessed to halt the search when O'Rourke lied to him regarding the officers' availability. The claim of negligent supervision was not well grounded in fact and therefore violates Rule 11.

M. **Plaintiffs alleged that based on past and future illegal searches authorized by the Norman Police Department, a class of cases exists with similar facts and law, which would authorize class certification.** (Complaint, p. 11–12; Supp. Trial Brief, p. 31–34; Pretrial Order, p. 16)

Again, not a scintilla of proof was ever offered, at pretrial or at trial, that previous searches had occurred or that similar claims of law and fact existed. This unfounded assertion violates Rule 11.

N. **Plaintiffs allege that the City has failed to act on behalf of the class.** (Complaint, p. 11; Trial Brief, p. 8)

No evidence was offered that the City has refused to act, when required to do so, on behalf of this or any other claimant at any time. Because there was no factual justification for alleging (1) that a class of similar cases exists or (2) that the City has refused to act, this assertion was filed in breach of Rule 11.

O. **Plaintiffs alleged that Sheriff Thomas Kennedy and his officers do not distinguish between the various types of warrants when relaying information concerning such warrants to the police.** (Supp. Complaint, p. 3)

Sheriff Thomas Kennedy was joined in a supplemental complaint filed on June 25, 1985, and was dismissed from the case on February 3, 1986. Kennedy's answer revealed that the Sheriff's Office normally relays *all* information on the warrant to parties seeking warrant information. The Sheriff's Office most assuredly does distinguish the type of warrant involved. Inadequate inquiry on this issue results in yet another violation of Rule 11.

P. **Plaintiffs alleged that the Sheriff's Office, as an operational policy, obtains night endorsements on *all* misdemeanor warrants so that these warrants may be served "at night in an indiscriminate, arbitrary, and capricious manner" in violation of the Oklahoma Statutes and the United States Constitution.** (Supp. Complaint, p. 3–4)

The Sheriff's Office does not seek out any particular type of warrant. The District Attorney's Office is the agency which files informations asking the District Court of Cleveland County to issue the appropriate type of warrant. The Sheriff's Office merely executes warrants according to judicial direction. The court finds that Rule 11 was violated by this assertion which was not grounded in fact.

5. In reviewing the record as a whole, the plaintiffs' claim for class certification, contained in the complaint and other papers filed with the court, had no reasonable factual foundation.

6. In reviewing the record as a whole, the plaintiffs' claim for injunctive relief, contained in the complaint and other papers filed with the court, was without a factual basis.

7. In reviewing the record as a whole, the plaintiffs' claims for relief against Robillard, Kennedy, Moore and Cook were wholly lacking in factual support.

8. As heretofore found in the June 19 Findings of Fact and Conclusions of Law, the plaintiffs and their counsel, acting in bad faith and with a purpose to harass the officers of the Norman Police Department and to penalize Linda Robillard, conjured the fiction that 2602 Chateau, Norman, Oklahoma, was not the legal and actual residence of Deborah Boyd and lied to the court in a deceptive effort to bring their claim within the more stringent standards laid down by the Supreme Court for searches of third-party residences. *See e.g. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

9. Michael Salem's actions in advocating the falsifications delineated above did unreasonably and unnecessarily multiply these proceedings causing unwarranted expense to opposing parties and this court.

### Conclusions of Law

1. This court joins the growing number of federal court judges who, when faced with congested dockets, frivolous litigation, and vexatious tactics, are forced to consider the imposition of sanctions to curb such abuse. While the courts in this circuit have been more hesitant than others to employ the use of sanctions,[4] the Tenth Circuit Court of Appeals has acknowledged and supported the growing use of sanctions by trial courts. *D.H. Marketers v. Freedom Oil & Gas, Inc.*, 744 F.2d 1443, 1444 (10th Cir.1984); *Sterling Energy, Ltd. v. Friendly National Bank*, 744 F.2d 1433, 1437–38 (10th Cir.1984); *In Re Sanction of Baker*, 744 F.2d 1438, 1440 (10th Cir.1984).

Rule 11 of the Federal Rules of Civil Procedure allows the courts to combat those practices which "tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the courts, obstruct the judicial process,

and bring the civil justice system into disrepute." Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 182 (1985). Since its inception in 1938, the goal of Rule 11 has been lawyer accountability. S.M. Kassin, *An Emperical Study of Rule 11 Sanctions* 2 (Federal Judicial Center 1985).

Prior to the 1983 Amendments, confusion surrounding the circumstances triggering the Rule, the conduct expected of attorneys, and the sanctions available to judges rendered Rule 11 ineffective. Advisory Committee Notes, Fed.R.Civ.P. 11. As a result, lawyers were held to "rather lax standards." *Weir v. Lehman Newspapers*, 105 F.R.D. 574, 575 (D.Colo.1985).

Rule 11 was amended in 1983 in an effort to reduce the reluctance of judges to impose sanctions for violative behavior. Advisory Notes, *supra*. The drafters make clear that lawyers are held to a standard far more stringent than the original Rule's good-faith requirement. "No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim." *Eastway Const. Corp. v. City of New York*, 762 F.2d 243, 253 (2nd Cir.1985).

2. The heart of Rule 11 is the certification made by a lawyer each time a paper is filed in court. By signing the complaint and other papers filed in this case, Michael Salem certified that he had conducted a reasonable pre-filing inquiry and determined that the paper was well grounded in fact and warranted by existing law or by a good-faith argument for the extension, modification, or reversal of existing law. Plaintiffs' counsel also warranted that the paper was not filed for harassment, delay, or any other improper purpose. *See* 5 Wright and Miller, *Federal Practice and Procedure* § 1333 (1985 Supp).

3. In evaluating Salem's actions, the court need not find subjective bad faith

---

**4.** A review of recent cases reveals that courts in the Second, Seventh and District of Columbia Circuits are among the most active in imposing

Rule 11 sanctions. Few reported decisions invoking Rule 11 have emerged from the Tenth Circuit.

in order to find a violation. *Eavenson, Auchmuty, & Greenwald v. Holtzman,* 775 F.2d 535, 540 (3rd Cir.1985). The Advisory Committee delineates the test as an objective determination of whether the assertions were reasonable under the circumstances at the time the paper was filed. *Id.* *See also Zaldivar v. City of Los Angeles,* 780 F.2d 823, 829 (9th Cir.1986) ("The new test represents an intentional abandonment of the subjective focus of the Rule in favor of an objective one."); *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 253 (2nd Cir.1985) ("Simply put, subjective good faith no longer provides the safe harbor it once did."); Schwarzer, *supra* 104 F.R.D. at 187 ("There is no room for a pure heart, empty head defense under Rule 11.").

■ 4. Like the familiar railroad crossing admonition to "Stop, look, and listen," Rule 11 required counsel to conduct a reasonable investigation of the facts and a competent search of the law *before* signing and filing any papers with the court. *Lieb v. Topstone Industries, Inc.,* 788 F.2d 151, 157 (3rd Cir.1986). *See also Eastway, supra* at 253.

In assessing the reasonableness of the inquiry, the Advisory Committee suggests that the court examine the amount of time available to Salem, the degree to which Salem had to rely on O'Rourke for information, and whether the papers were based on a "plausible" view of the law. Salem must show that he did not solely rely on his client's assurances, but that he, as a lawyer, acquired information which supported a reasonable belief that a factual basis existed for the papers filed. Schwarzer, *supra* 104 F.R.D. at 187.

5. Based upon a review of the entire record, the court finds and concludes that Salem did not conduct a reasonable inquiry prior to filing the complaint and other papers in this suit. Salem relied primarily on his clients' falsified version of events, having by his own admission received no response from the only other source he consulted, the City of Norman. This misplaced reliance occurred although Salem had 19 months in which to conduct his own investigation by consulting the Robillards, the O'Rourkes' neighbors, the Police Academy, instructor Sam Chapman, the individual officers, or other Norman officials. The papers filed in this case were wholly lacking in factual support and, accordingly, no factual basis, much less a reasonable one, existed for the demands made by the plaintiffs.

■ 6. Salem likewise had an obligation to consult his law books before filing papers in court. Advisory Notes, *supra.* It is impermissible for a complainant to place the burden of legal research on an opposing party. Assertions of law must be accompanied by authority or, if arguing for a modification, the attorney must present the existing law and then call for a change. *Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986). Salem was required to research the law before filing any papers. He could not merely "make an assertion of law and hope that it will turn out to be true." *Id.*[5]

Counsel's most blatant violations of the Rule in failing to research the law were his demand for a class certification pursuant to Rule 23, Fed.R.Civ.P. and his assertion that the sheriff's practice of keeping all warrants in the same file violates the Constitution.

The court is aware of the requirements for class certification under Rule 23(b)(2). The papers filed by counsel seem to neglect that even if the plaintiffs meet the requirements of (b)(2), the prerequisites of numerosity, similarily, typicality, and representativeness contained in 23(a) must also be met. Had counsel researched the case law in 23(b)(2) actions, he would have determined that this was not a proper case for certification because neither 23(a) nor 23(b)(2) can be satisfied on the facts present here.

Counsel provided no authority for his assertions that the commingling of war-

---

5. Counsel's attempts to classify the contempt warrant as a misdemeanor warrant in this case exemplify such an unresearched assertion coupled with blind hope. *See* note 6, *infra.*

rants by the Sheriff's Department is unconstitutional. Such unsupported and inaccurate assertions are precisely the conduct Rule 11 seeks to eradicate. *Thorton, supra,* at 1154.

7. The Sixth Circuit recently reversed a district court's refusal to impose sanctions in a case similar to the O'Rourke case. In *Albright v. Upjohn Co.,* 788 F.2d 1217 (6th Cir.1986), a plaintiff sued nine pharmaceutical manufacturers after she suffered teeth discoloration resulting from her ingestion of tetracycline drugs. She admitted that she did not know which company manufactured the drugs she ingested. The plaintiff sued all nine defendants, alleging that they "aided and encouraged" each others' failure to adequately warn and placed the burden on each defendant to exculpate itself. Later five defendants successfully obtained a summary judgment and requested Rule 11 attorney fees. *Id.* at 1218–19.

The Court of Appeals found that the plaintiff failed to conduct a reasonable prefiling inquiry, although eleven months had passed from the time the cause of action accrued until suit was filed. The failure of the plaintiff's attorney to investigate, since the information was not complex and the attorneys were experienced litigators, intentionally shifted the burden of proof and production to the defendants. *Id.* at 1220–21.

■ *Albright* mirrors Mr. Salem's efforts to require Cook, Moore, Robillard, and Kennedy to bear the burden of exculpating themselves in this case. Sanctions should be imposed for filing an overly broad complaint which names unrelated defendants or for persisting in claims against Cook, Moore, Robillard, and Kennedy beyond a point where they were no longer, if ever, well grounded in fact. *Schwarzer, supra* 104 F.R.D. at 189.

■ The complaint alleged that all the defendants were working in a conspiracy to violate the plaintiffs' civil rights. Salem did not conduct a reasonable inquiry although 19 months passed before suit was filed. While this case may have involved complex issues, Mr. Salem is not a naive and inexperienced attorney. By his own testimony at the July 7, 1986, sanctions hearing he is a lawyer with vast experience in civil rights litigation who has received various awards for his expertise in the field. Improper conduct under Rule 11 by an experienced attorney is a basis for imposing a more serious penalty. *Eastway Const. Corp. v. City of New York,* 637 F.Supp. 558 (E.D.N.Y.1986); *Lieb, supra,* at 158.

■ 8. An award of attorney's fees under 28 U.S.C. § 1927 must be based on more egregious behavior than a sanctions award under Rule 11. The Tenth Circuit Court of Appeals first set forth the standards to be utilized in this circuit in *Dreiling v. Peugeot Motors of America,* 768 F.2d 1159 (10th Cir.1985). The court must find that (1) the attorney multiplied the proceedings and (2) that the attorney's actions were vexatious and unreasonable. *Id.* at 1165. The attorney's actions are vexatious and unreasonable if the lawyer acted in bad faith. *Id.*

■ A specific finding of bad faith has been entered by this court in both the original findings of fact and conclusions of law and in these findings and conclusions with regard to sanctions and attorney fees. After reviewing the record, the court finds that Michael Salem acted in bad faith after filing the suit by creating and perpetuating with the O'Rourkes the lie that 2602 Chateau was not Deborah Boyd's legal residence. This vexatious and unreasonable behavior was a deceitful attempt to coerce this court into judging the defendants' actions under the strict standards for searches of third-party residences.

Additionally, the court finds that Salem acted in bad faith when litigating the claim that the City of Norman was negligent in the screening, hiring, training and supervising of its police officers. Although no credible evidence was ever offered to support the allegation of negligence, well over half of the time at trial was devoted to

Salem's dogged insistence in pursuing this frivolous claim.[6]

Salem's bad faith multiplied the proceedings unnecessarily for both opposing parties and this court. Accordingly, this court finds Michael Salem liable under 28 U.S.C. § 1927 for the attorney fees arising from his bad-faith behavior.

9. Having found Michael Salem and the plaintiffs in violation of Rule 11 and having found Michael Salem in violation of 28 U.S.C. § 1927, the court now turns to the sanctions award of attorney fees and costs. The defendants have presented evidence supporting their demand for attorney fees in the amount of $59,287.02. A bill of costs has also been filed in the amount of $2,098.85.

■ The court notes that attorney fees and costs awarded under Rule 11 as sanctions must be caused by the filing of the improper paper and the amount awarded must be reasonably necessary. Schwarzer, *supra* 104 F.R.D. at 202. The papers which violated Rule 11 in this case included the complaint, supplemental complaint, trial brief, supplemental trial brief, and pretrial order. Due to the widespread and persistent nature of these violative assertions, the court finds that a substantial amount, if not all of the fees claimed by the defendants arose from efforts to refute these false and frivolous claims.

■ The court notes the plaintiffs' claims of duplication of services by defense counsel. *See Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir.1983). Yet, the court is pursuaded that the presence of both counsel for the individual officers and counsel for the City of Norman at many of the depositions and hearings was necessary to avoid a possible conflict of interest. The court finds the amounts charged to be reasonable and necessary.

10. The court finds that it cannot award the entire amount of attorney fees requested by the defendants as sanctions without chilling the prospects for future litigation. The court is well aware that, even though the fees in this case will be awarded on grounds other than 42 U.S.C. § 1988, assessing massive attorney fees against civil rights litigants may discourage private citizens from acting as private attorney generals. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

■ Though the imposition of sanctions is mandatory under Rule 11, the type of sanctions to be employed rests with the discretion of the court. Advisory Committee Notes, Fed.R.Civ.P. 11. In exercising its discretion, the court considers the ability of both the plaintiffs and counsel to pay the amount requested by the defendants.[7]

■ 11. For his violation of both Rule 11 and 28 U.S.C. § 1927, Michael Salem is ordered by the court to pay a portion of the excess costs of litigation caused by his violative behavior. Yet, considering the

---

6. Salem spent a large amount of this time exploring the officers' training in serving misdemeanor warrants. Mr. Salem called the defendant officers as his own witnesses and then drilled them extensively in an attempt to change their testimony. These tactics wasted an inordinate amount of trial time, and the issue was entirely irrelevant. At the time of the search at issue in this case, Oklahoma law imposed no limits on punishment available a court in contempt proceedings. 21 O.S. § 566 (1981). Therefore, any contempt warrant issued could potentially result in imprisonment for a period exceeding one year. Not until 1984, more than a year after these events, did the Oklahoma Legislature amend § 566 making contempt a misdemeanor offense.

Moreover, the order granting partial summary judgment in this case, attached hereto as Appendix "A", specified that the warrant would be evaluated under the Fourth Amendment and any failure to comply with Oklahoma's warrant technicalities is immaterial.

7. The evidence at the July 7 hearing indicated that the O'Rourkes are left with $537 after meeting their obligations each month. They own their own home, valued today at $83,000–$86,000. The home is subject to a $26,500 mortgage which the family has been making payments on for thirteen years. They own an $800 camper and Mr. O'Rourke owns a number of expensive tools. Some, but not all, of these tools are used by his sons in their roofing business. Mr. O'Rourke has loaned his sons' business $600–$700. The family also owns some automobiles.

ability of Mr. Salem to pay and the potential chilling effect of awarding the entire $59,869.02 allowed defense counsel under 42 U.S.C. § 1988, the sanction is hereby reduced to a payment of one third (⅓) of the fair, reasonable, and necessary attorneys' fees in the amount of $19,956.34 as a minimum for the aforesaid offense.

12. For acting in bad faith by perpetuating the fraud that 2602 Chateau was not Deborah Boyd's legal address and other reasons hereinabove set out, the plaintiffs have also violated Rule 11 and are liable for the excessive fees and costs generated by their actions. However, the court recognizes that a large sanctions amount might act as a deterrent to other private citizens who desire, in good faith, to bring suit for the deprivation of their civil rights. To avoid such an undesirable result, the sanctions here are reduced to a payment of court costs. Michael O'Rourke, Shirley O'Rourke, and Kathleen O'Rourke are ordered by the court to pay court costs as sanctions in the amount of $2,098.85 to the court clerk. Said amount is to be refunded by the clerk to those other persons or parties who paid such costs.

13. The aforesaid sanction of attorney fees shall be paid by Michael Salem to the clerk of this court. The payment or payments when made to the clerk shall be divided and paid to Mr. Burton J. Johnson and the City of Norman according to their fee claims filed with the court in an amount equal to 59% and 41% respectively.

14. In its ruling today, the court is mindful of Judge Schwarzer's sage observation:

> [i]f judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self defense.

Schwarzer, *supra* 104 F.R.D. at 205.

The court finds the task of disciplining attorneys and litigants most regretful and distasteful. The language of Rule 11, however, mandates that this court begin to take serious steps to curb litigation misuse and abuse.

An appropriate judgment will accordingly be entered herein.

EXHIBIT "A"

### ORDER GRANTING PARTIAL SUMMARY JUDGMENT

This matter comes before the court upon cross motions for summary judgment filed by plaintiffs and defendants. Upon careful consideration of the motions, their supporting briefs and attachments, the supplemental briefs on certain questions of law requested of the parties by the court, and the entire record in the case to date, the court finds that with respect to most of the issues raised by these motions there exist genuine issues of material fact such that summary disposition is inappropriate. However, two issues originally raised by plaintiff, and briefed by both sides upon the specific request of this court, appear to be questions of law which may be properly resolved by the court at this time, thereby possibly simplifying and abbreviating the trial proceedings scheduled to commence in this action on May 13, 1986.

Plaintiff has asserted that the bench warrant for the arrest of Deborah Boyd, which lies at the root of this dispute, was invalid at the time of the alleged search of the O'Rourke residence under certain provisions of Oklahoma state law relating to nighttime arrests for misdemeanor offenses, 22 O.S. § 189 (1982), and the necessity for having an arrest warrant available to show an arrestee at the time of an arrest, 22 O.S. § 192 (1981). The court is persuaded, however, upon its research into applicable authority, that the cited state statutes are not controlling in this action arising under 42 U.S.C. § 1983 and the United States Constitution. It may well be that the bench warrant involved here and the search allegedly conducted pursuant to its authority were illegal under Oklahoma state law.

But the question here is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.

*Cooper v. California,* 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967); *cf. McNeese v. Board of Education,* 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963) ("It is immaterial whether respondents' conduct is legal or illegal as a matter of state law."). *citing Monroe v. Pape,* 365 U.S. 167, 171–187, 81 S.Ct. 473, 475–84, 5 L.Ed.2d 492 (1961); *Anderson v. Haas,* 341 F.2d 497, 499 (3rd Cir.1965). What may be said of the search itself also applies to the warrant upon which it was based. A warrant which is technically invalid under state law may nonetheless be adequate to pass muster under the Fourth Amendment.

Although defendants have not specifically moved for summary judgment on these issues, the plaintiffs have so moved. It is generally accepted that once a party has moved for summary judgment a court may *sua sponte* grant summary judgment against that party even though the opposing party has made no cross-motion under Rule 56. *Pueblo of Santa Ana v. Mountain State Telephone and Telegraph Co.,* 734 F.2d 1402, 1408 (10th Cir.1984) *citing* 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720, at 29–30 (1983).

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendants, City of Norman, Kelvin Winters, Doug McKenzie and Steve Cain, have partial summary judgment against the plaintiffs, Michael W. O'Rourke, Shirley O'Rourke and Kathleen O'Rourke, on the questions of whether the conduct of the individual police officer defendants violated the plaintiffs' constitutional rights because they failed to comply with the requirements of 22 O.S. § 189 (1981) and 22 O.S. § 192 (1981). Counsel will be expected to restrict their presentations of evidence and argumentation accordingly. However, the court will give full consideration to the hour at which the challenged alleged search occurred when it determines whether the search satisfied the Fourth Amendment's requirement of reasonableness.

## JUDGMENT ON ATTORNEYS' FEES, COSTS AND SANCTIONS

Based upon the Findings of Fact and Conclusions of Law filed herein this day, and the Findings of Fact and Conclusions of Law filed on June 19, 1986.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the $59,-869.02 claimed by defendants' counsel Burton J. Johnson and the Norman City Attorney's Office, is a fair, reasonable and necessary amount.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Michael Salem, for his violations of Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, shall pay as sanctions to the court clerk, at a minimum, one third (⅓) of the defendants' attorney fees as costs in the amount of $19,956.34.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that upon payment or payments by Michael Salem, the court clerk shall divide said sum proportionately between Burton J. Johnson and the Norman City Attorney's Office in the amount of 59% and 41% respectively until the entire $19,956.34 is paid and Burton J. Johnson has received $11,774.24 and the Norman City Attorney's Office has received $8,182.10. Said sum shall draw the legal rate of interest from date.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that for their violations of Fed.R.Civ.P. 11, the plaintiffs, Michael W. O'Rourke, Shirley M. O'Rourke, and Kathleen O'Rourke, shall pay court costs as sanctions in the amount of $2,098.85 to the court clerk. Upon payment by the plaintiffs, the clerk will refund this amount to those persons or parties who paid the costs.