Michael W. O'ROURKE, Shirley M.
O'Rourke and Kathleen O'Rourke,
Plaintiffs–Appellants,

v.

The CITY OF NORMAN, a Municipal
Corporation; Kelvin Winter and Doug
McKenzie, individually and in their of-
ficial capacity as duly authorized law
enforcement officers for the City of
Norman; and Steve Cain, individually
and in his official capacity as a police
supervisor and a duly authorized law
enforcement officer for the City of Nor-
man, Defendants–Appellees.

Nos. 86–2098, 86–2219.

United States Court of Appeals,
Tenth Circuit.

May 23, 1989.

Micheal Salem of Salem Law Offices, Norman, Oklahoma, and Louis W. Bullock of Bullock & Bullock, Tulsa, Okl., for plaintiffs-appellants.

Burton J. Johnson (Patricia D. Herron, Asst. City Atty., Norman, Oklahoma, with him, on the briefs), of Looney, Nichols, Johnson & Hayes, Oklahoma City, Okl., for defendants-appellees.

Don Ed Payne of Payne & Welch, Hugo, Okl., and Louis F. Cooper, Bethesda, Md., filed an amicus curiae brief, for American Civ. Liberties Union of Oklahoma; Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., filed an amicus curiae brief, for American Civ. Liberties Union of the Nat. Capital Area; Karen L. Long of Watson & McKenzie, Oklahoma City, Okl., filed an amicus curiae brief, for Oklahoma Educ. Ass'n.

Before McKAY, BRIGHT * and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

This is an appeal from a judgment against the plaintiffs in a non-jury trial. *O'Rourke v. City of Norman*, 640 F.Supp. 1451 (W.D.Okla.1986). The plaintiffs' claim alleged a violation of 42 U.S.C. § 1983 arising from the nighttime search of their home pursuant to a daytime bench warrant for contempt issued by a small claims court. Basing its decision on extensive findings of fact and erroneous conclu-

sions of law, the district court awarded the defendants attorney's fees and costs totalling $19,956.34 from Micheal Salem, plaintiffs' attorney, pursuant to Rule 11 and 28 U.S.C. § 1927, and $2,098.85 from the plaintiffs pursuant to Rule 11. These awards are also on appeal, and the cases are consolidated here.

The plaintiffs make the following conclusions and requests for relief from this Court:

1. The ruling of the trial court that the bench warrant was a felony and not a misdemeanor should be reversed as provided herein.

2. The ruling of the trial court that the invalidity of the bench warrant under state law is not relevant to a federal civil rights action should be reversed and appropriate declaratory relief and damages entered against Defendants, or in the alternative, this matter remanded for a new trial.

3. The policy, practice, procedure or custom of the Defendant City of permitting searches of homes incident to bench warrants and misdemeanors and in the absence of exigent circumstances should be declared unconstitutional as a violation of the Fourth Amendment.

4. The sanctions imposed against Plaintiffs and their counsel should be reversed.

5. This Court should enter an order of recusal and random reassignment of this action in the district court.

6. This Court determine the prevailing party for the purposes of this appeal and make an order providing for costs and attorneys fees as provided by 42 U.S.C. Section 1988.

Appellants Brief-in-Chief at 49.

Because we find that the district court erred in its conclusions of law which were at the very core of this § 1983 claim, we REVERSE. Consistent with this reversal and plaintiffs' success on the substance of their complaint, we also REVERSE as to costs and attorney's fees awarded the de-

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

fendants, and REMAND on the issue of costs and attorney's fees for the plaintiffs as provided by 42 U.S.C. § 1988.

## I.

The following facts are relevant to this decision.[1] On May 16, 1983, at approximately 10:00 p.m., Officers Winter and McKenzie of the Norman Police Department in Oklahoma arrived at the home of the O'Rourkes to execute a state, daytime bench warrant for contempt.[2] The warrant was to be served on Deborah Boyd, the O'Rourkes' emancipated daughter. Obvious from the face of the warrant was that: (1) the order authorized the arrest of Deborah Boyd for contempt; (2) the warrant was issued on February 22, 1983—three months prior to its execution; (3) it was not endorsed for nighttime execution; and, (4) the warrant was issued for failure to appear in a small-claims proceeding as designated by "SC" before the warrant number.[3] Nevertheless, despite all of these factors, police officers Winter and McKenzie entered the O'Rourke home at 10:00 p.m. (*O'Rourke*, 640 F.Supp. at 1455.) They asked if Deborah Boyd were there; the O'Rourkes answered in the negative and this was undisputed at trial.[4] (*O'Rourke*,

640 F.Supp. at 1456.) Mr. O'Rourke, doubtful of the legality of the nighttime search of his home, telephoned the Norman Police Department and spoke with Lt. Cain, the supervisor on duty. Lt. Cain informed Mr. O'Rourke that he already knew of the search and that "if the officers had a warrant for Boyd's arrest and probable cause to believe that she might be in the residence, they did not need a search warrant and did have a right to enter the residence and search for Boyd." (*O'Rourke*, 640 F.Supp. at 1456.) Lt. Cain did not address the validity of the nighttime execution of a daytime bench warrant, whether Deborah Boyd was at the home, or whether, indeed, the O'Rourke home was Deborah Boyd's residence or a third party residence. The conversation terminated with Mr. O'Rourke informing Lt. Cain that the officers did not have his permission to search his home. (*O'Rourke*, 640 F.Supp. at 1456.) Mr. O'Rourke then called upon his daughter, Kathleen, and wife to witness his statements to the police officers that he would not interfere with the search, but was not in any way consenting to it. (*O'Rourke*, 640 F.Supp. at 1456.) At trial, Lt. Cain testified he would not have stopped the officers from searching.

1. We have adopted only the facts set out in this opinion. Our failure to rule on the district court's finding of facts to support "probable cause" should not be construed as our acceptance of the district court's reasoning, e.g., we do not hold that it was reasonable for a police officer to assume that the plaintiffs were lying because the officer "had on previous occasions encountered deceit and hostility in dealing with other members of the O'Rourke family, notably [sic] the son Wesley, in a criminal context." *O'Rourke*, 640 F.Supp. at 1460. Our legal system has a long-time aversion to "corruption by blood." *Loving v. Virginia*, 388 U.S. 1, 7, 87 S.Ct. 1817, 1821, 18 L.Ed.2d 1010 (1967); *Korematsu v. United States*, 323 U.S. 214, 242–43, 65 S.Ct. 193, 205–06, 89 L.Ed. 194 (1944) (Jackson, J., dissenting), *reh'g denied*, 324 U.S. 885, 65 S.Ct. 674, 89 L.Ed. 1435 (1945); *Skinner v. Oklahoma*, 316 U.S. 535, 541–42, 62 S.Ct. 1110, 1113–14, 86 L.Ed. 1655 (1942).

2. The execution of the warrant was precipitated by a telephone call to the Norman Police Department by Linda Robillard, the mother of Claire Robillard. Claire Robillard was also on the line. Linda Robillard conveyed that her daughter had a judgment against Deborah Boyd

and a warrant out for her arrest. Robillard told the operator at the Norman Police Department that Deborah Boyd "normally lives out of town." She was in town for a child support issue. "She lives, when she's in Norman, with her parents at 2602 Chateau." Robillard said she wasn't sure if the address was 2602 or not. The operator asked if Deborah Boyd were there now. Robillard answered, "I'm not certain of that." Claire Robillard told the operator "If you go late at night you know she's there because she has a baby." Again the operator asked whether she was there or not. Linda Robillard replied, "Well I've been told that she is, and it's possible the police could go there tonight and she would be there." The operator then replied, "O.K., well, we'll see what we can do tonight."

3. Captain Darian DeBolt was unsure of what "SC" designated since "we rarely, if ever, serve these types of warrants." Investigation, Conclusion, and Recommendations Concerning Complaint 83–09, Section 8, p. 4. In the same memorandum he quoted Officer Winter as also ignorant of what "SC" designated. *Id.*

4. The district court found that the O'Rourkes' home was also the residence of Deborah Boyd.

The police officers searched every room in the O'Rourke home. They even searched a bedroom in which the O'Rourkes' two year old grandson lay sleeping. It was undisputed at trial that the police officers were courteous and the district court so held. (*O'Rourke,* 640 F.Supp. at 1457.) Deborah Boyd was not in the O'Rourkes' home at the time of the search, nor was there any evidence that she had been.

At trial, the defendants called as an expert witness, Samuel Chapman, a Professor of Political Science at the University of Oklahoma and instructor at the Norman Police Academy. He acknowledged instructing many of the Norman police officers, including some of the defendants, and opined that the police officers "performed within the context of accepted police practice." Furthermore, he agreed with or recalled making comments to the effect that "[w]hether or not it's the person's residence is not the obligation of the Police. They are looking for a person; not a residence.... If it's the home of a third person and she does not live there, but probable cause exists to believe she is there, it's not intrusive and improper police procedure to search." Clearly he did not have a working knowledge of *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), decided three years pri-

or.[5] Chapman went on to testify that the search of the O'Rourkes' home was not a search at all—it was merely a "recognizance." This is contrary to all Fourth Amendment law known to this Circuit.[6]

Also admitted into evidence and relevant to this appeal was a copy of an "Office Memorandum" written by Norman Police Captain DeBolt, and addressed to City of Norman Police Chief, Don Holyfield. The subject was "Investigation, Conclusion and Recommendations Concerning Complaint 83–09." Complaint 83–09 was filed by Mr. O'Rourke on the evening of the search. In pertinent part, the office memorandum contained erroneous conclusions of law—in fact, very old law. As to the authority of the police to make a home arrest pursuant to an arrest warrant, the memo cited *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970). There was no mention of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980), the Supreme Court's constitutional mandate at the time of the search and for the three years prior.[7] Also contained in the memo was the following statement, "Appellate courts are not clear on this issue. Some courts have affirmed the power of the police to search residences not that of the defendant, if they have probable

---

**5.** In *Steagald,* the Supreme Court held that the search of a third-party residence for the subject of an arrest warrant requires a search warrant. *Id.* at 212–13, 101 S.Ct. at 1647–48.

**6.** On the last day of trial, while explaining the justifications for a verdict against the plaintiffs and sanctions, the trial judge stated:

I want to say further, that the expert, Noah Goddard who came here from Tecumseh, Kansas and testified as a plaintiff's expert witness and Dr. Chapman testified as the defendant's expert witness and from Dr. Chapman's examination and cross examination of Mr. Goddard, to me, you completely destroyed his testimony. It wasn't worth a nickel. Mr. Goddard's testimony absolutely was void of any credibility at all.

On the other hand, Chapman has been an instructor and he's done much with the City of Norman and he's capable and he's trained and has trained and continues to train the Norman City Police Officers and he's to be commended for his work as such. (Tr., Vol. XXI, Ruling of the Court, p. 9.)

**7.** In *Payton,* the Supreme Court in a dictum stated that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within.*" *Id.* at 603, 100 S.Ct. at 1388 (emphasis added). This *Payton* dictum will not support the police action for the Court's discussion there related to an arrest warrant for a felony, *id.* at 602, 100 S.Ct. at 1388, not a contempt as in this case, which is not a felony, as we discuss *infra,* slip op. at 1470–71. Moreover, the police officer's conversation with the O'Rourkes relating to the absence of Deborah Boyd from the premises left police without any reason to believe the suspect was within that dwelling. Finally, that dictum in *Payton* does not undercut the determination in the *Steagald* case that an arrest warrant for a third person will not justify the search of the homeowner who is not named in the warrant. Such a search violates the homeowner's rights under the fourth amendment. *Steagald,* 451 U.S. at 211–16, 101 S.Ct. at 1647–50.

cause to believe that the defendant is therein; others have denied that power." Obviously the Captain was ignorant of *Steagald*, controlling law at the time and for the two years prior. In the same memo, Captain DeBolt declared the search of the O'Rourke home illegal because the warrant was improperly served in the nighttime.[8] At trial, Norman Police Chief Don Holyfield testified that he read the report of Captain DeBolt and agreed with it, but questioned *only* the paragraphs relating to the necessity of a night endorsement for a bench warrant.

Quoting from appellants' brief, "The facts of this case start small,[9] but like a[n] ... avalanche, sweep down the constitutional slope of the Fourth Amendment and to date have gathered a record on appeal approaching 1000 pages and a trial transcript of over 1250 pages."

## II.

### A.

■ The prerequisite question we must address is whether the bench warrant issued for contempt of court was a felony warrant under Oklahoma law. If it were a felony warrant, nighttime execution would have been authorized under Oklahoma law, and constitutionally valid. The district court held that contempt in Oklahoma was a felony at all relevant times to this case. The basis for its determination was federal criminal law, common law, and *de novo* statutory interpretation. We disagree with its determination, and the legal reasoning used to arrive at it.

It is axiomatic that the states, acting pursuant to the Tenth Amendment's "police powers," define state criminal law.[10] At issue, here, in this § 1983 action is whether federal criminal law or common law defining contempt is a basis for defining contempt in Oklahoma, irrespective of contrary Oklahoma judicial interpretation spanning the past forty years.

Since the federal government is strictly limited by the powers enumerated in the Constitution, Congress may only criminalize an activity if it is acting pursuant to an enumerated power. We have seen the genesis of federal criminal law with the Mail Fraud Statute [11] enacted in 1872 pursuant to the postal power. Later, under the taxing power, Congress enacted the federal tax crimes.[12] However, for most federal criminal laws in the past century, the jurisdictional basis is the Commerce Clause [13]

---

**8.** For nineteen months plaintiffs sought unsuccessfully to obtain the information contained in this memo, dated June 10, 1983. Plaintiffs' original complaint was filed January 2, 1985. Discovery was requested and defendants failed to comply. On August 8, 1985, plaintiffs filed a Motion to Compel Discovery.

**9.** The small claims judgment against Deborah Boyd resulted from a debt owed to her roommate, Claire Robillard, amounting to $125.00. When she failed to appear to show cause for nonpayment, the bench warrant was issued.

**10.** In the Constitution, the power to regulate criminal law has been left to the individual States and this power cannot be abridged by Congress. All the federal government can do is insure that the States do not, via police powers, "invade the sphere of national sovereignty, obstruct or impede the exercise of any authority which the Constitution has confided to the nation, or deprive any citizen of rights guaranteed by the federal Constitution." T. Cooley, 7th ed. (1903), *A Treatise on the Constitutional Limitations* at 830–32.

**11.** 18 U.S.C. § 1341.

**12.** 26 U.S.C. §§ 7201, 7202, 7203, and 7206.

**13.** In 1901, pursuant to the Commerce Clause, Congress passed an Act for the Suppression of Lottery Traffic. In *Champion v. Ames*, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903), this Act was held constitutional. In 1910, based on Congress' authority to regulate commerce, Congress enacted the Mann Act which was held constitutional in *Hoke v. United States*, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913). These two cases laid the foundation for Congressional enactment of our modern federal criminal law with federal jurisdiction relying on the Commerce Clause. *Perrin v. United States*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199, *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979) (Travel Act, 18 U.S.C. § 1952, requires an interstate commerce nexus); *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (the Supreme Court held that in a prosecution under the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. App. § 1202(a), interstate commerce nexus must be proven; otherwise, 1202(a) dramatically intrudes upon traditional state crime jurisdiction, *id.* at 349–50, 92 S.Ct. at 523–24); *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (loansharking,

set forth in Article I, Section 8. Put simply, absent Constitutional violations, there is no jurisdictional basis for a federal judge to redefine state criminal law. As such, we hold that it was error for the district court to look to federal criminal contempt to decide that contempt in Oklahoma may be a felony; therefore, it is a felony.[14] *O'Rourke,* 640 F.Supp. at 1462. The district court devoted three full pages of analysis to contempt, but not once did it cite an Oklahoma case. The disregard of forty years of interpretation by Oklahoma courts was a violation of the Tenth Amendment. The federal court must look to state criminal law as judicially interpreted by the state courts, and we do so, here.

### B. Contempt Under Oklahoma Law

Until 1982, the Court of Criminal Appeals of Oklahoma and the Oklahoma Supreme Court were not in harmony over the nature and classification of contempt. *Gilbert v. State,* 648 P.2d 1226, 1230 (Okla. Crim.App.1982). However, on one crucial point they were always in accord—contempt was not a felony in Oklahoma.

As early as the 1940's, the Oklahoma Court of Criminal Appeals defined contempt as a misdemeanor at most. *Brown v. State,* 89 Okl.Cr. 443, 209 P.2d 715, 720 (1949) (basing its determination on Okla. Stat. tit. 21, § 565 (1941) "Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court," the Oklahoma court held that in the absence of express provisions making the offense of contempt a felony, one found guilty thereof

cannot be punished by confinement in the penitentiary.[15] The sentence of the defendant herein to the penitentiary was in excess of the court's power to pronounce. *Id.* at 720)). *Brown* also announced that contempt in Oklahoma is controlled by mandatory state constitutional and state statutory provisions and *not by common law. Id.* at 719. In essence, in 1949, contempt in Oklahoma was defined by Okla.Stat. tit. 12, § 1390 (1941); Okla.Stat. tit. 21, §§ 565–568 (1941); and, Const. art. 2, § 25 as judicially interpreted in *Brown. Id.* This was later affirmed in *Seay v. Howell,* 311 P.2d 207 (Okla.1957) (contempts of court are defined by Constitution and statute and not by common law). *Id.* at 209. In 1972, *Roselle v. State of Oklahoma,* 503 P.2d 1293 (Okla.Crim.App.1972), consistent with *Brown* held that the "crime" of contempt was a misdemeanor. *Id.* at 1295. Citing to Okla.Stat. tit. 21, § 566 (1971), "Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court," the court reasoned that since the statute does not specify whether contempt is a felony or misdemeanor, the definition of "imprisonment" would be determinative. In the ordinary sense "imprisonment" contemplates the common jail, rather than the penitentiary; therefore, the crime of contempt is a misdemeanor. *Id.*

In another line of cases, the Oklahoma Court of Criminal Appeals defined contempt as *sui generis,* i.e., not civil or criminal. *Pate v. State,* 429 P.2d 542, 547 (Okla. Crim.App.1967); *Sullivan v. State,* 419 P.2d 559, 560 (Okla.Crim.App.1966) (citing

---

a federal crime under the Consumer Credit Protection Act, 82 Stat. 159, 18 U.S.C. § 891, is a permissible exercise by Congress of its powers under the Commerce Clause); and *United States v. Elders,* 569 F.2d 1020 (7th Cir.1978) (in prosecution under 18 U.S.C. § 1951, the Hobbs Act, the court held that there was a nexus required between the extortionist conduct and interstate commerce).

**14.** In addition to using federal law and common law as a basis, the district court reasoned that since the Oklahoma statute defining contempt imposed no limitation on potential punishment, contempt was a felony. It cited to *Soetarto v. Immigration and Naturalization Service,* 516 F.2d 778, 781 (7th Cir.1975), as authority, and held that "during the time period relevant to

this case, all contempts were felonies under Oklahoma law...." *O'Rourke,* 640 F.Supp. at 1463. *Soetarto* involved the question of whether or not a conviction in the Netherlands for the theft of about $135 and a ring valued at approximately $100 was a crime of "moral turpitude" as the term was used within the deportation statute.

**15.** At the time of the search in the O'Rourke home, Okla.Stat. tit. 21, § 566 (1981) provided:
"[p]unishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court."
The wording of the statute was precisely that construed in *Brown.*

*Fulreader v. State,* 408 P.2d 775, 776 (Okla.1965)).

In 1982, the Court of Criminal Appeals of Oklahoma followed the Oklahoma Supreme Court and declared that direct contempt proceedings "are neither civil nor criminal in character but are *sui generis.*" *Gilbert v. State,* 648 P.2d 1226, 1230 (Okla.Crim. App.1982) (citing *State ex rel. Young v. Woodson,* 522 P.2d 1035, 1039 (Okla.1974); *Fulreader v. State,* 408 P.2d 775, 776–77 (Okla.1965); *State ex rel. Short, Att'y Gen. v. Owens,* 256 P. 704, 708–09 (Okla.1927)). The appellant in *Gilbert* was seeking the classification of contempt as a misdemeanor so that he would be "formally arraigned and provided a jury trial." *Id.* at 1228. By classifying contempt as *sui generis,* these rights could no longer be claimed. The court declared that no such rights attached since contempt was now *sui generis* and "[a]ll prior holdings to the contrary *on this point* are overruled...." *Id.* at 1231 (emphasis added). Therefore, at the time of the nighttime search of the O'Rourke home in 1983, contempt was defined as *sui generis* under all Oklahoma law.

The categorization of contempt as not a felony is pivotal to the outcome of this case. Under Oklahoma law, if the warrant is issued for commission of a crime defined as a felony, no nighttime endorsement is required. The warrant may be served day or night. Okla.Stat. tit. 22, § 189.[16] Also under Oklahoma law, persons charged with misdemeanors may not be subject to arrest at night unless a judge determines it necessary. Okla.Stat. tit. 22, § 189.[17] Only after an assessment of necessity may the judge add an endorsement permitting nighttime execution. The classification of contempt as *sui generis* does not vitiate this requirement, it strengthens it. Absent

legislative authority for day or nighttime service, it is for the issuing magistrate to determine the reasonableness of a nighttime execution. *Wiggin v. State,* 755 P.2d 115, 116 (Okla.Crim.App.1988); *Fletcher v. State,* 735 P.2d 1190, 1193 (Okla.Crim.App. 1986); *Yates v. State,* 73 Okl.Cr. 51, 117 P.2d 811, 813 (1941).

The bench warrant for the arrest of Deborah Boyd had no nighttime endorsement. For search and seizure purposes, nighttime in Oklahoma starts thirty minutes after sunset and ends thirty minutes before sunrise. Okla.Stat. tit. 47, § 11–801(b) (1981).[18] The search of the O'Rourke home at 10:00 p.m. was well after sunset.

In sum, the district court was clearly in error in its classification of contempt as a felony in Oklahoma. First it looked to federal criminal law for guidance. Federal criminal law does not define state criminal law. Second, it looked to common law. While this may be permissible in some instances, it was contrary to Oklahoma law. Third, the district court judge completely ignored forty years of judicial interpretation of the Oklahoma contempt statute and interpreted the Oklahoma statute *de novo.* On all three bases we find error. At all times relevant to this case, contempt was classified as *sui generis* in Oklahoma. This court could find no Oklahoma case defining contempt as a felony and neither did the district court.

## III.

■ The primary issue on appeal is whether the nighttime execution of a daytime bench warrant in a family residence for an offense defined in Oklahoma as *sui generis* violates the Fourth Amendment's

---

16. Section 189 reads:

    **Arrest, when made**

    If the offense charged is a felony, the arrest may be made on any day, and at any time of the day or night. If it is a misdemeanor, the arrest cannot be made at night, unless upon the direction of the magistrate endorsed upon the warrant.

17. *Id.*

18. Although there was no Oklahoma *case* construing "nighttime" in 1983, Okla.Stat. tit. 47, § 11–801 (1981) was in effect since 1981 and was later used in *Fletcher,* 735 P.2d at 1197, as the controlling definition for search and seizure purposes. We also note that Okla.Stat. tit. 21, § 1440 defines nighttime in Oklahoma as the period between sunset or sunrise. Under either statute in effect in 1983, the search of the O'Rourke home at 10:00 p.m. was certainly in the nighttime.

prohibition against unreasonable searches and seizures.

■ The essential inquiry when faced with challenges under the Fourth Amendment is whether the search or seizure was reasonable—reasonableness is analyzed in light of what was reasonable at the time of the Fourth Amendment's adoption. *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 283–84, 69 L.Ed. 543 (1925); *Boyd v. United States*, 116 U.S. 616, 622–23, 6 S.Ct. 524, 527–28, 29 L.Ed. 746 (1886); *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir.1979); *United States ex rel. Boyance v. Myers*, 398 F.2d 896, 897–98 (3d Cir.1968). It is axiomatic that the Fourth Amendment was adopted as a direct response to the evils of the general warrants in England and the writs of assistance in the Colonies. *Steagald v. United States*, 451 U.S. at 220, 101 S.Ct. at 1651–52 (1981); *Payton v. New York*, 445 U.S. at 583–84, n. 26, 100 S.Ct. at 1381, n. 6 (1980); *United States v. Chadwick*, 433 U.S. 1, 7–8, 97 S.Ct. 2476, 2481–82, 53 L.Ed.2d 538 (1977); *Stanford v. Texas*, 379 U.S. 476, 481–82, 85 S.Ct. 506, 509–10, 13 L.Ed.2d 431 *reh'g denied*, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965); *Boyd*, 116 U.S. at 624–30, 6 S.Ct. at 528–32 (1886). Therefore, we look to history for guidance on reasonableness.

### A.   General Warrants

In 1762, the English government, seeking to censure authors, printers and publishers of seditious and treasonable papers, namely the *North Briton*, issued general arrest warrants authorizing home searches. Pursuant to these "roving commissions," the government, on the scantiest evidence, arrested forty-nine printers in three days, "even taking some from their beds in the middle of the night." The printers brought suit against the government messengers for false imprisonment. Chief Justice Pratt ruled the warrants illegal. The Lon-

don jury awarded the plaintiffs 300 pounds sterling in damages.[19]  In response to defendants' claim of excessive verdict, Pratt admitted that 20 pounds sterling would have been sufficient for six hours of imprisonment;  however, he found that:

> [T]he small injury done to the plaintiff, or the inconsiderableness of his station and rank in life did not appear to the jury in that striking light which the great point of the law touching the liberty of the subject appeared to them at the trial; they saw a magistrate over all the king's subjects, exercising arbitrary power, violating Magna Carta, and attempting to destroy the liberty of the kingdom, by insisting on the legality of this general warrant before them;  they heard the King's Counsel, and saw the solicitor of the Treasury endeavor to support and maintain the legality of the warrant in a tyrannical and severe manner.  These are the ideas which struck the jury on the trial;  and I think they have done right in giving exemplary damages.[20]

In one case, a printer received a verdict for 400 pounds sterling.  The government appealed to the King's Bench, which affirmed the decision and held that *"[i]t is not fit that the judging of the information should be left to the officer.  The magistrate should judge, and give directions to the officer."*  (Emphasis added.)[21]

The English government defended all actions arising from the general warrants—the damages totalled 100,000 pounds sterling.  These cases were praised and welcomed in England and "even in faraway America."  Wilkes, a member of Parliament and the author of the *North Briton*, was corresponding with leading Americans of the period—James Otis, Samuel Adams, John Hancock, John Adams and Josiah Quincy.  N. Lasson, *The History and Development of the Fourth Amend-*

**19.**  *Huckle v. Money,* 2 Wils.K.B. 206, 95 Eng. Rep. 768 (1763).  Cited in N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937), at 44.

**20.**  *Id.* at 45, n. 111.

**21.**  *Money v. Leach,* 3 Burr. 1692, 1742, 97 Eng. Rep. 1050, 1075 (1765).  Cited in N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* (1937), at 47.

*ment to the United States Constitution* (1937), at 43–50.

Finally in April of 1776, the House of Commons resolved that the general warrants were illegal. Coming from the floor debates, William Pitt, Earl of Chatham, eloquently conveyed the clear message:

> The poorist man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement.

T. Cooley, 7th ed. (1903), *A Treatise on the Constitutional Limitations* at 425, n. 1 (also quoted in *Payton,* 445 U.S. at 601, n. 54, 100 S.Ct. at 1388, n. 54; and *Miller v. United States,* 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958)).

## B. Writs of Assistance in the Colonies

Meanwhile on this side of the Atlantic, the argument centered around the writs of assistance employed by customs officers for discovering smuggled goods. The writs were also general warrants but they were even more abusive, i.e., they were not returnable at all after execution. In essence, they were a continuing license to search a home with practically absolute discretion delegated to the petty officer. N. Lasson, *supra,* at 51–59.

In the *Writs of Assistance Case* of 1761, Boston became the center of the debate. James Otis electrified the audience with his argument against the practice. He pronounced the writs " 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in our English law book;' since they placed 'the liberty of every man in the hands of every petty officer.' " *Boyd,* 116 U.S. at 625, 6 S.Ct. at 529. *Accord Stanford v. Texas,* 379 U.S. 476, 481, 85 S.Ct. 506, 509, 13 L.Ed.2d 431 (1965). Later in recounting the speech, John Adams declared that:

> " 'Mr. Otis's oration ... breathed into this nation the breath of life.' He 'was a

flame of fire! Every man of a crowded audience appeared to me to go away, as I did, ready to take arms against the Writs of Assistance. Then and there was the first scene of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.... [I]n 1776, he grew to manhood and declared himself free.' "

N. Lasson, *supra,* at 51–59. Today she is embodied in the Fourth Amendment.

## C. Early Aversion to Nighttime Searches

Of special significance to this case on appeal is that despite the unbridled discretion delegated to the petty officer by the general warrants in England, nighttime execution in a home was not authorized. 2 Hale, *Pleas of the Crown,* Stokes & Ingersoll ed. 1847, 113; T. Cooley, *supra,* at 430; *accord United States v. Gibbons,* 607 F.2d at 1326 (1979); *United States ex rel. Boyance v. Myers,* 398 F.2d at 897–98 (1968). Even the Writs of Assistance, more odious and abusive than the general warrants, permitted searches of dwellings only in the daytime. N. Lasson, *supra,* at 54. *Accord Gibbons,* at 1326; *Myers* at 897–98. We see this aversion to nighttime searches of the home codified in two statutes passed by our first Congress: Act of July 31, 1789 § 24, 1 Stat. 43, authorizing the search for goods subject to duty in "dwelling—house, store, building ... upon application on oath or affirmation to any justice of the peace, be entitled to a warrant to enter such house, store, or other place (in the *day time only* ).…" *Id.* (Emphasis added); and Act of March 3, 1791 § 29, 1 Stat. 206, authorizing the search of distilled spirits *"in the daytime,* upon request, to enter into all and every houses, storehouses, ware-houses.…" (Emphasis added.)

In the words of Justice Frankfurter, "[s]earches of the dwelling house were the special object of this universal condemnation of official intrusion. Night-time search was the evil in its most obnoxious form." *Monroe v. Pape,* 365 U.S. 167, 210,

# 1474

81 S.Ct. 473, 496, 5 L.Ed.2d 492 (1961).[22]

## D. Contemporary Law

Aside from history, we do not write on a clean slate on this issue. Looking toward more contemporary analysis of nighttime searches, we find clear support for the unreasonableness of this nighttime search. In *United States v. Merritt*, 293 F.2d 742 (3d Cir.1961), the Third Circuit held that where a warrant provided for execution in the daytime, but was executed in the nighttime, it was legally invalid. As such, the police officers' entry into the defendants' apartment was on the same plane as an entry without a warrant and, therefore, a violation of the Fourth Amendment. *Id.* at 746. In *United States ex rel. Boyance v. Myers*, 398 F.2d 896 (3d Cir.1968), the Third Circuit, pursuant to a writ of habeas corpus, held that a warrant expressly limited to daytime searches, executed in a private home in the nighttime was "constitutionally invalid." *Id.* at 899. It held the search unreasonable based on the common law aversion to nighttime searches, early Congressional statutes authorizing only daytime searches, similar limitations imposed under state statutes, and the directive in Fed.R.Crim.P. 41(c). *Id.* at 888–89. In *Dorman v. United States*, 435 F.2d at 385 (1970), the United States Court of Appeals for the District of Columbia Circuit, *en banc*, held that nighttime entry of a home to effect an arrest necessarily implicates "reasonableness" under the Fourth Amendment and "may elevate the degree of probable cause ... both as implicating the suspect, and as showing that he was in the place entered...." *Id.* at 393. In *United States v. Smith*, 340 F.Supp. 1023 (D.Conn. 1972), the District Court of Connecticut held that to justify the nighttime execution of a state daytime warrant in an occupied family home, there must be *shown to a magistrate* a greater proof that the property to be seized is on the premises than is necessary for a daytime search. "[T]he fact that a private dwelling is entered at night has constitutional significance." *Id.*

at 1029 (citing *Myers*, 398 F.2d at 897–98, and *Jones v. United States*, 357 U.S. at 498, 78 S.Ct. at 1257). The court held that the nighttime search did not meet the reasonableness requirement of the Fourth Amendment. *Id.* at 1029. In *United States v. Gibbons*, 607 F.2d at 1320, this circuit, presented with the reasonableness of a nighttime search of a car trunk pursuant to a state daytime warrant, held that the "factor of a nighttime search is sensitively related to the reasonableness issue" in the Fourth Amendment. *Id.* at 1326. Its determination was based on the common law aversion to nighttime searches prior to the adoption of the Fourth Amendment. *Id.* Holding the nighttime search of a car trunk to be reasonable, this circuit qualified its holding by explaining that the: (1) "search involved no intrusion into a home"; (2) the search of a car does not present a strong case for claiming unreasonableness for a nighttime search; and (3) the facts presented the "necessity of immediate police action." *Id.* at 1327.

To determine that a warrant limited to daytime execution authorizes the nighttime search of a home is to completely eviscerate the issuing magistrate's determination of reasonableness.

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.... When the right of privacy must yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent. (Footnote omitted.)

*Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948).

658, 664–89, 98 S.Ct. 2018, 2022–35, 56 L.Ed.2d 611 (1977).

---

**22.** Overruled solely on the issue of municipal liability under 42 U.S.C. § 1983. *Monnell v. New York City Dept. of Social Servs.*, 436 U.S.

It was the absence of the neutral and detached magistrate which led to the abuses in England and the Colonies. It is the absence of the neutral and detached magistrate's determination of the reasonableness of the nighttime search of the O'Rourke home which renders it unreasonable under the Fourth Amendment.

## IV. RECUSAL

■ We are being asked in the first instance to exercise our inherent power in the administration of appeals and remands to reassign this case in the event of retrial or remand. Ordinarily 28 U.S.C. § 144 and § 455 are invoked at the district court level to effectuate recusal. However, these statutory provisions are not the exclusive route for disqualification. The appellate court's authority to reassign exists apart from the judicial disqualification statutes. *Offutt v. United States*, 348 U.S. 11, 16–18, 75 S.Ct. 11, 14–16, 99 L.Ed. 11 (1954); *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 396, 69 L.Ed. 767 (1925); *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 780 (9th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986); *Verniero v. Air Force Academy Sch. Dist. No. 20*, 705 F.2d 388, 395 (10th Cir.1983) (McKay, J., dissenting); *United States v. Ritter*, 273 F.2d 30, 32 (10th Cir.1959), cert. denied, 362 U.S. 950, 80 S.Ct. 863, 4 L.Ed. 2d 869 (1960); *United States v. Hatahley*, 257 F.2d 920, 926 (10th Cir.), cert. denied, 358 U.S. 899, 79 S.Ct. 222, 3 L.Ed.2d 148 (1958). However, absent proof of personal bias, we remand to a new judge only under extreme circumstances.

■ In *Sears*, the Ninth Circuit held that "reassignment is admissible to preserve the appearance of justice." *Id.*, 785 F.2d at 780; accord *United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir.1979); *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (*en banc*). While the "appearance of justice" basis for reassignment seems persuasive in the context of 42 U.S.C. § 1983, we hesitate to formally order reassignment. Instead, we remand to the district court for its own consideration of whether recusal is warranted. In the remand, we are mindful that the function of the district court is to determine the attorney's fees to be allowed to the O'Rourkes under 42 U.S. C. § 1988. The district judge who decided this case is familiar with the amount of effort put into the trial by the attorney for the O'Rourkes. We believe this effort can be recognized by the district judge and will be fairly assessed, such an assessment to be subject to our review, should any of the parties feel aggrieved by such a determination.

## CONCLUSION

■ Considering the common-law origins of the aversion to nighttime searches, the abuses present in the minds of the Framers, the protection historically afforded the sanctity of the home, and the cases cited above, we hold that the search of the O'Rourke home at 10:00 p.m. without a nighttime endorsement on the warrant was unreasonable under the Fourth Amendment. As such, we REVERSE the district court on that issue. On the issue of municipal liability, we hold the City of Norman liable. We find it unnecessary to undergo analysis on the issue of municipal liability since the order and stipulation entered into and signed by the City of Norman provides that "in the event that the Plaintiffs should prevail upon any issue ..., the Defendant shall pay to the Plaintiffs the sum of $4,000.00 heretofore as damages." We find this binding as to the City. In addition, in their briefs both Appellants and Appellees agree that damages are limited to $4,000.00. Appellees argue that the stipulation is not a waiver of the city's defense as to municipal liability. We disagree. The plain language establishes liability upon the plaintiffs' success on any issue. Appellees also argue that the stipulation does not amount to a waiver of the qualified immunity of the individual police officers. Assuming there was a waiver, the police officers are liable; assuming there was not, on the issue of qualified immunity, we find that the law was clearly established to satisfy the standard set forth in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Therefore, we hold Police Officers Winter and McKenzie liable—they should have known that the nighttime execution of a daytime warrant in a family residence was unreasonable under the Fourth Amendment. In addition, we hold Lt. Cain liable under § 1983. As supervisor in a position of responsibility, he knew or should have known of the misconduct, and failed to prevent the violation of the Fourth Amendment rights of the plaintiffs. *McClelland v. Facteau*, 610 F.2d 693, 696–67 (10th Cir. 1979). We therefore order the district court to enter judgment in favor of the plaintiffs in the total amount of $4,000 and against the defendants jointly and severally.

In view of our decision, we must also vacate the imposition of sanctions against the plaintiffs and their counsel. The suit was not frivolous.

Based on the circumstances giving rise to the Fourth Amendment, we conclude that a police officer does not have unbridled authority under a warrant—it is for an impartial judge to decide what is reasonable. *A fortiori* it is for an impartial judge to decide the reasonableness of a nighttime search in a home. The case here does not present consent, hot pursuit or exigent circumstances. The police officers' nighttime execution of a daytime warrant in the O'Rourke home for an offense defined as *sui generis* was like "burning a barn to roast an egg,"[23] and we so hold.

We REVERSE on the constitutionality of the search and REMAND on the issue of attorney's fees and costs pursuant to 42 U.S.C. § 1988. We direct the district court to enter judgment in favor of the plaintiffs, jointly and severally, against each of the defendants, together with interest in an appropriate amount to be computed by the district court, such interest to run from and after the date of the stipulation referred to in this opinion.

23. N. Lasson, *supra*, at 68, n. 60 (referring to the whole customs systems and the writs of assist- ance).